## COMMONWEALTH *vs.* RICHARD ALLISON.

Middlesex. March 9, 2001. - July 25, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Homicide. Robbery. Perjury. Practice, Criminal,* Capital case, Bill of particulars, Severance, Argument by prosecutor. *Joint Enterprise. Evidence,* Joint enterprise, Bias of government witness, Prior inconsistent statement, Motive, Photograph. *Witness,* Bias, Immunity. *Conflict of Interest. Attorney at Law,* Conflict of interest, Shared office.

Evidence presented at the trial of indictments, including testimony properly admitted under the joint venture exception to the hearsay rule, was sufficient to support the defendant's convictions of murder [674-676] and armed robbery [676-677], each on the basis of joint venture.

At the trial of an indictment charging perjury arising out of the defendant's testimony before a grand jury, the judge properly within her discretion denied the defendant's motion for a bill of particulars, where the indictment set forth sufficient facts to put the defendant on notice as to the nature of the perjury charge and to establish the materiality element of the crime. [677-678]

A criminal defendant failed to demonstrate prejudice arising from the joinder for trial of indictments charging murder and armed robbery with an indictment charging perjury. [679-680]

At a criminal trial, the judge properly limited further cross-examination of a Commonwealth witness concerning possible bias, where further inquiry was not requested, where the defendant failed to show that any further inquiry would have produced information beneficial to his case, and where the prejudicial impact of such inquiry would have outweighed any impeachment value of the testimony. [680-681]

At a criminal trial, the judge did not place any restriction on the defendant's impeachment of a Commonwealth witness through his prior inconsistent testimony before the grand jury. [682]

There was no support for a criminal defendant's contention that the prosecutor improperly sought to rehabilitate the character of a Commonwealth witness before he had been impeached [682-683], or that the witness's response to the prosecutor's questioning improperly suggested a pattern of bad acts on the part of the defendant [683].

At a murder trial, the judge properly admitted in evidence photographs depicting the victim's body with seventy-nine stab wounds and a gunshot to the head, where such evidence supported the Commonwealth's theory of murder in the first degree based on extreme atrocity or cruelty. [683-684]

A prosecutor's comment, made in his opening statement, that an immunized Commonwealth witness "was not given immunity for perjury" was an ac-

curate statement of the law and did not constitute improper vouching for the witness. [685]

Certain remarks of the prosecutor made in closing argument to the jury at a murder trial did not constitute improper comment on the defendant's failure to testify [686]; further, the prosecutor's statement that the victim's body "testified" as to what transpired did not constitute an improper appeal to the jurors' emotions, in light of the prosecutor's closing as a whole, the evidence presented at trial, and the judge's instructions to the jury [686-687].

Evidence presented at a hearing on a criminal defendant's motion for a new trial, which alleged that he was denied the effective assistance of counsel due to the shared office space arrangement between his trial counsel and counsel for certain codefendants, and the association of his counsel with counsel for another codefendant, supported the judge's conclusion that the defendant failed to establish the existence of an actual conflict of interest or a potential conflict of interest that materially affected his case. [688-697]

INDICTMENTS found and returned in the Superior Court Department on June 23, 1994.

The cases were tried before *Regina L. Quinlan,* J., and a motion for a new trial, filed on February 20, 1997, was heard by her.

*James W. Rosseel* for the defendant.

*Margaret A. Peterson,* Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant, Richard Allison, was convicted by a jury of (1) murder in the first degree on a theory of extreme atrocity or cruelty; (2) armed robbery; and (3) perjury. The defendant filed a motion for a new trial with the county court while his appeal was pending. A single justice of this court transferred the motion to the Superior Court pursuant to G. L. c. 211, § 4A. After a hearing, the motion for a new trial was denied. In this consolidated appeal of the defendant's convictions and the denial of his motion for a new trial the defendant claims error in (1) the denial of his motion for a required finding of not guilty as to joint venture; (2) the denial of his motion for a bill of particulars; (3) the denial of his motion to sever the trial of the perjury indictment from that of the murder and armed robbery indictments; (4) various evidentiary rulings; (5) the prosecutor's misconduct in the opening statement and closing argument; and (6) the denial of his motion for a new trial,

which alleged that he was prejudiced by a conflict of interest between his trial counsel and counsel for codefendants by virtue of their office-sharing arrangement. The defendant also asks us to exercise our power under G. L. c. 278, § 33E, and order a new trial or direct the entry of a verdict of murder in the second degree or manslaughter. We affirm the convictions.

1. *Facts.* We summarize the facts the jury could have found, reserving other details for discussion of the issues presented. On April 17, 1994, Thomas Moran, the victim, left his girl friend's house at approximately 4 P.M. He went to a basketball court at Harris Park in East Somerville where he met the defendant, Gerald Sullivan, Jeffrey Hardy,[1] Christopher Rogovich, and other friends. They spent most of the afternoon playing basketball and drinking beer. At one point, Sullivan and Hardy left to buy some marijuana treated with PCP, or "dust." The defendant, Sullivan, Rogovich, and Moran smoked the dust. The effects of the drug were rather weak, and Moran began to tease them, claiming that the drugs were fake and that Sullivan and Hardy were "chumps" and "idiots." Hardy and Sullivan became increasingly angry as Moran persisted.

At approximately 8 P.M., the defendant, Sullivan, Hardy, and Moran set out for a bar in Everett in a car driven by Hardy. En route they stopped at Jackie Vargus's apartment in Everett, where they drank and talked. Moran continued to tease Sullivan and Hardy about the drugs. Sullivan and Hardy telephoned Steven Murphy, and then drove to his house in Everett. Murphy gave them a loaded .32 semiautomatic handgun and showed them how to use it. Sullivan and Hardy returned to Vargus's apartment with the loaded gun.

The group then went to a bar. At approximately 10 P.M., Hardy told Rogovich he wanted to leave the bar, but without Moran. Sullivan, Hardy, the defendant, and Rogovich left, but Moran caught up with them. They drove away in Hardy's car. Hardy stopped on Mystic Avenue in Medford. He whispered to Rogovich to get rid of Moran, and then meet him at a Dunkin' Donuts shop. The entire group, however, including Moran, ended up at Dunkin' Donuts. As they were leaving Dunkin' Donuts, Hardy

[1]See *Commonwealth* v. *Hardy*, 431 Mass. 387 (2000).

asked Moran loudly and repeatedly if he was going home. Annoyed, Moran asked if they were trying to get rid of him. Hardy drove to Moran's girl friend's house in Somerville. Moran got out of the car and yelled, "You're nothing but a fucking punk, Jeff," and "Youse guys got beat. Youse guys ain't nothing but fake gangsters." Hardy then invited Moran back. Moran got back in the car.

Hardy drove up Route 93 to South Border Road and stopped in a wooded area. The defendant, Hardy, and Sullivan walked to a grassy area and talked for a few minutes. When they returned, Hardy told Moran and Rogovich that they were going to meet the drug dealers who sold them the fake dust. They drove to a school yard near Columbus Park in Medford and walked to a baseball field. Hardy "positioned people" in certain places and told them from what direction the drug dealers would be coming. Sullivan pointed a gun at Moran's head and pulled the trigger. The gun misfired and Moran said, "Get that fucking gun out of my face." Hardy demanded the gun and shot Moran in the face. Moran covered his face with his hands and said, "Hardy shot me." Hardy said, "Now you'll shut your fucking mouth." Moran fell to the ground. The defendant, Sullivan, and Hardy stabbed him repeatedly, while Moran pleaded with them to stop. Sullivan said, "Get his money, get his wallet." Moran lunged at Sullivan. Rogovich, who testified to these events, heard another gunshot, then returned to Hardy's car where he was joined by Sullivan, who was carrying a bloody knife. Sullivan sat in the driver's seat and "peeled out" of the lot.

The defendant took a cab to a bar in Everett where he stayed for approximately forty-five minutes. He left the bar and went to Steven Murphy's house. The defendant told Murphy that he needed to talk. The defendant then dumped the gun that Murphy had given to Sullivan and Hardy earlier that evening onto the bed. There were no bullets left in the clip. The defendant told Murphy: "We just did Tommy. . . . Jeff, Gerry, Rogie, and me just killed Tommy down at Columbus Park." The defendant continued, "We just kept stabbing him . . . because he wouldn't go down." The defendant added, "We tried sawing his head off, but it was too hard." The defendant then asked for something to wear and asked Murphy what to do about the gun. Finally, the

defendant asked Murphy for a shovel because "Tommy was just laying there out in the open." Sometime later, Sullivan and Hardy arrived at Murphy's house. Sullivan asked how much money Moran had. The defendant pulled out $1,000, divided it among the three of them, and left the apartment.

Moran's body was discovered at approximately 5:30 A.M. the next day, with seventy-nine stab wounds to the head, face, neck, chest, arms, legs, and back, as well as a gunshot wound to the face. The medical examiner testified that it was possible the victim had been alive during the infliction of all the injuries. Moran's clothes had a torn pocket. Evidence was presented at trial that Moran left the apartment that day with approximately $1,000 in his pocket.

On May 25, 1994, the defendant testified before a grand jury and denied participating in, or having any information about, the murder. On June 23, 1994, the grand jury returned indictments against the defendant for the murder and armed robbery of Moran, and for perjury stemming from his testimony before the grand jury. The grand jury also returned indictments against Sullivan and Hardy for their part in the murder and armed robbery. They all received separate trials.

The defendant's theory at trial was that he did not, as principal or joint venturer, shoot, stab, or rob Moran. The defendant did not testify at trial, but relied on the testimony of a friend, Moran's mother, and an attorney for statements he made consistent with his theory. The defendant also attempted to impeach the testimony of the two key Commonwealth witnesses, Rogovich[2] and Murphy.[3]

2. *Sufficiency of the evidence of a joint venture.* At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty. The motion was denied. The motion was renewed at the close of all the evidence, and again it was denied. On appeal, the defendant argues that the evidence

---

[2]Rogovich had been granted immunity by a single justice of this court under G. L. c. 233, § 20D. The defendant attempted to impeach his testimony by attacking his ability to observe the events, his alcohol and drug consumption, his prior convictions, and his grant of immunity.

[3]The defendant attempted to impeach Murphy regarding his cocaine use, his prior convictions, the "favorable" treatment he had received from the Commonwealth, and his alleged motive for revenge against the defendant.

was insufficient to support convictions of murder and armed robbery on the basis of joint venture.[4] When reviewing the sufficiency of the evidence as to joint venture, we consider the evidence in the light most favorable to the Commonwealth and ask whether a rational jury could have found beyond a reasonable doubt that the defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Bianco*, 388 Mass. 358, 366-367, *S.C.*, 390 Mass. 254 (1983). Proof that the defendant shared the requisite mental intent needed for a conviction may be met with circumstantial evidence. See *Commonwealth* v. *Lynch*, 428 Mass. 617, 621 (1999).

The defendant first contends that the trial judge erred in permitting, over his objection, Rogovich and Murphy to testify as to the statements of Hardy and of Sullivan under the joint venture exception to the hearsay rule, and that this evidence must be excluded when determining the sufficiency of the evidence of joint venture. Under that exception, "[o]ut of court statements by joint criminal venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it." *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994). "Statements may be introduced under this exception only if the existence of the joint criminal venture is shown by some other evidence." *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990). The defendant's own statements to Murphy and Rogovich's testimony about the manner in which the killing occurred provided ample basis to establish the existence of a joint venture to justify the admission of the hearsay statements of Hardy and Sullivan. Moreover, operative statements evidencing the existence of an agreement, i.e., verbal acts, are not hearsay, but are

---

[4]The judge instructed the jury that the Commonwealth was proceeding under the theory that the defendant was either a principal or a joint venturer as to the murder and the armed robbery indictments. The jury were not asked to specify separate verdicts, as a specific unanimity instruction was not required in the circumstances. See *Commonwealth* v. *Ellis*, 432 Mass. 746, 761 (2000). The defendant does not challenge the sufficiency of the evidence that he acted as a principal.

independently admissible. See *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 246 (2000). Sullivan's statement, "Get his money, get his wallet," is such a statement. The joint venture hearsay exception, therefore, does not apply to that statement. There was no error.

The nub of the defendant's argument on appeal involves the third element of joint venture. He argues that evidence of the meeting at South Border Road was too speculative to establish joint venture liability, and therefore his mere presence at the scene of the crime is insufficient. See *Commonwealth* v. *Chinn*, 6 Mass. App. Ct. 714, 717 (1978). A rational juror could have concluded that the defendant, Hardy, and Sullivan discussed a plan to kill Moran when they left Rogovich and Moran in the car and walked to a grassy area to talk before returning to announce their plan to "meet the drug dealers," who never appeared. The ensuing coordinated activity permitted an inference that a plan to murder Moran was formulated at South Border Road. Cf. *Commonwealth* v. *Mercado*, 24 Mass. App. Ct. 391, 397 (1987).

In any event, an anticipatory compact is not necessary for joint venture liability, as long as "at the climactic moments the parties consciously acted together in carrying out the criminal endeavor." *Commonwealth* v. *Fidler*, 23 Mass. App. Ct. 506, 513 (1987), citing *Commonwealth* v. *Morrow*, 363 Mass. 601, 608-609 (1973). Rogovich's testimony that he saw the defendant, Sullivan, and Hardy crouched over the victim making stabbing gestures is sufficient to establish the defendant's liability for the murder both individually and as joint venturer. See *Commonwealth* v. *Brooks*, 422 Mass. 574 (1996). The defendant's admissions to Murphy also establish that he acted both as principal and as joint venturer in the murder.[5]

The motion for a required finding of not guilty as to the charge of armed robbery was also properly denied. The defendant argues that the evidence was insufficient to show that there was a plan to rob the victim, or that he knew the others

---

[5]Contrary to the defendant's assertions, the defendant's statements to Murphy are not hearsay. They are admissible as statements of a party-opponent. See *Commonwealth* v. *Morgan*, 422 Mass. 373, 379 (1996). See also P.J. Liacos, Massachusetts Evidence § 8.8.1, at 496-499 (7th ed. 1999).

were armed with a dangerous weapon at such time. He first claims that the intent to steal came as an afterthought to the previous assault, too late to support a conviction of robbery. See *Commonwealth* v. *Moran*, 387 Mass. 644, 646 (1982). The evidence was sufficient to show that an intent to steal developed *during* the assault on Moran, and as such could provide support for a conviction of robbery. *Id.* After Sullivan directed the others to get Moran's money, there was evidence that Moran lunged at Sullivan. The jury could have found that the focus of the joint venture shifted at that point from one of killing to one of robbery, and that the three men continued to stab and beat Moran for the purpose of taking his money. The jury also could have inferred from the evidence that the defendant was aware that Hardy and Sullivan were armed at the time Sullivan urged them to rob Moran and at the time Moran's money was taken. See *Commonwealth* v. *Patterson*, 432 Mass. 767, 773 (2000).

3. *Bill of particulars.* The defendant claims error in the denial of his motion for a bill of particulars because the perjury indictment failed to aver the materiality of any false statements, and because he was left "to guess" which of his statements the Commonwealth intended to prove perjurious.

Although there may be circumstances under which art. 12 of the Massachusetts Declaration of Rights requires a court to issue a bill of particulars,[6] the decision to order a bill of particulars is a matter of sound judicial discretion. See, e.g., *Rogan* v. *Commonwealth*, 415 Mass. 376, 378 (1993); *Commonwealth* v. *Wood*, 4 Gray 11 (1855); Reporters' Notes to Mass. R. Crim. P. 13, Mass. Ann. Laws, Rules of Criminal Procedure, at 134 (Lexis 1997).[7] An indictment is not inadequate if the offense is charged with sufficient clarity to show a violation of law and to permit the defendant to know the nature of the accusations

---

[6]Under art. 12 of the Massachusetts Declaration of Rights, "no subject shall be held to answer for any crimes or offense until the same is fully and plainly and substantially and formally described to him."

[7]The defendant's reliance on *Commonwealth* v. *Welansky*, 316 Mass. 383, 396 (1944), and *Commonwealth* v. *Massad*, 242 Mass. 532 (1922), for the proposition that he is entitled as a matter of right to a bill of particulars on request, is misplaced. These decisions, governed by the practice under the former G. L. c. 277, § 40, also applied the abuse of discretion standard. See *Commonwealth* v. *Hayes*, 311 Mass. 21, 25 (1942).

against him. See *Commonwealth* v. *Green,* 399 Mass. 565 (1987). Thus, it is not necessary for the Commonwealth to set forth in the indictment every element of the crime. *Id.* Additionally, the failure to present the indictment in the statutory form of G. L. c. 277, § 79, is not fatal to the indictment. This statute explicitly provides that while the forms are sufficient in cases to which they are applicable, "forms as nearly like the forms . . . may be used."

Materiality is an element of perjury that usually must be alleged, *Commonwealth* v. *Louis Constr. Co.,* 343 Mass. 600, 607 (1962), but an indictment will not be defective for failure to include it as an element if sufficient facts are set forth in the indictment to establish materiality. See *Commonwealth* v. *Pollard,* 12 Met. 225, 229 (1847); *Commonwealth* v. *Knight,* 12 Mass. 274, 277 (1815). It is clear from the face of the indictment that the defendant's denial of any participation in or knowledge of the death of Thomas Moran was material to the investigation into his death. Because the indictment adequately apprised the defendant of the charge against him, the failure to aver that the alleged perjurious statements were material is not fatal. See *Commonwealth* v. *Bacon,* 374 Mass. 358, 360 (1978).

The defendant's additional claim that the indictment failed to specify which of his grand jury statements the Commonwealth claimed to be perjurious also fails. There is no requirement that a particular statement serve as the basis for a perjury indictment. False testimony, taken as a whole, may provide the basis for perjury. See *Commonwealth* v. *Giles,* 353 Mass. 1, 11 (1967). Here, the indictment alleged that the defendant "after being lawfully sworn . . . did wilfully and corruptly testify and say *in substance and effect* that he had not participated in nor had any information about the death of Thomas Moran" (emphasis added). The indictment was sufficient to put the defendant on notice as to the nature of the perjury charge, and that "his testimony before the grand jury had a reasonable and natural tendency to affect some aspect of the inquiry." *Commonwealth* v. *Perreault,* 13 Mass. App. Ct. 1072, 1073-1074 (1982).[8] There was no error in the denial of his motion for a bill of particulars.

---

[8]The defendant contends that *Commonwealth* v. *Perreault,* 13 Mass. App. Ct. 1072, 1073-1074 (1982), is not controlling because the Appeals Court

4. *Motion to sever the perjury indictment.* The defendant filed a motion to sever the trial of his perjury indictment from the murder and robbery indictments. See Mass. R. Crim. P. 9 (d) (2), 378 Mass. 859 (1979). The motion judge, who was also the trial judge, denied the motion, ruling that the offenses were related and the evidence to be offered would be similar. The defendant contends, however, that the joinder of these offenses was "not in the best interests of justice" because, while he wanted to testify with regard to the murder and armed robbery indictments, he did not want to testify with regard to the perjury indictment. Additionally, the defendant argues that joining the perjury indictment with the murder and armed robbery indictments was inherently prejudicial in that the jury would be predisposed into believing that the defendant was a "liar."

Rule 9 (a) (2) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 859 (1979), permits joinder of related offenses if "they are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." Absent a constitutional requirement, whether the indictments joined for trial should be severed is a matter within the sound discretion of the judge. See Mass. R. Crim. P. 9 (a) (3), 378 Mass. 859 (1979). The decision will be reversed only if there has been a clear abuse of discretion. See Mass. R. Crim. P. 9 (d) (2); *Commonwealth* v. *Best*, 381 Mass. 472 (1980).

To show an abuse of discretion the defendant must demonstrate that joinder resulted in prejudice or that his substantive rights have been adversely affected. See *Commonwealth* v. *Sylvester*, 388 Mass. 749 (1983). Bare assertions of prejudice are not enough. Rather, the defendant must make a "strong showing of prejudice." *United States* v. *Hershenow*, 680 F.2d 847, 861 (1st Cir. 1982). Additionally, the defendant must show that any prejudice from joinder was beyond the curative power of the judge's limiting instructions. See *Commonwealth* v. *Gal-*

misconstrued our decision in *Commonwealth* v. *Giles*, 353 Mass. 1, 11 (1967). We disagree. We require judges to consider the testimony as a whole because these questions and answers reflect a continuous examination, and it could be unfair to view each statement in isolation. *Id.*

*lison,* 383 Mass. 659, 671 (1981). It is not enough for the defendant simply to assert that he wanted to testify about some charges, but not others. See *Commonwealth* v. *Wilson,* 427 Mass. 336, 345-346 (1998); *Commonwealth* v. *Baran,* 21 Mass. App. Ct. 989 (1986). Rather, he must make a "convincing showing that he had both important testimony to give concerning one count and a strong need to refrain from testifying about the other count." *Commonwealth* v. *Williams,* 18 Mass. App. Ct. 945, 947 (1984), citing *Baker* v. *United States,* 401 F.2d 958 (D.C. Cir. 1968), cert. denied, 400 U.S. 965 (1970). The defendant has failed to make the necessary showing.

His claim of prejudice is also belied by the fact that evidence of his other offenses would have been admissible at separate trials on each indictment. See *Commonwealth* v. *Wilson, supra* at 346. The evidence of perjury would have been admissible "to the extent necessary to allow the prosecution to 'present as full a picture as possible of the events surrounding the incident itself.' " *Id.* at 347, quoting *Commonwealth* v. *Marrero,* 427 Mass. 65, 67 (1998). It was relevant to the defendant's consciousness of guilt and his attempt to conceal his involvement in the murder and armed robbery, and therefore was admissible as to those charges. Correspondingly, the evidence of his involvement in the murder and armed robbery would have been admissible at a trial on the perjury indictment to show that his false grand jury testimony was material.

The defendant's assertion that the jurors were predisposed to believe that he had lied is meritless. The judge instructed the jury to consider each of the charges separately, and clearly explained that the grand jury does not decide guilt or innocence of the offenses charged. There is no indication in the record that this instruction was inadequate to offset any possible prejudice from the joinder, or that the jury inappropriately applied evidence of one indictment toward the other. See *Commonwealth* v. *Montanez,* 410 Mass. 290, 304 (1991). There was no error.

5. *Evidentiary rulings.* The defendant claims that he was prejudiced by a variety of erroneous evidentiary rulings.

(a) *Cross-examination of Steven Murphy regarding promises, rewards, or inducements.* The defendant argues that the judge

erred in refusing to permit inquiry whether any promises were made to Murphy regarding his father's pending drug case in Suffolk County. Defense counsel asked the witness whether any promises had been made to him relative to any other members of his family. Murphy responded affirmatively, and the judge held a voir dire outside the presence of the jury to inquire what promises were made, and whether further inquiry was warranted. Murphy testified that a promise had been made to him that his family would be safe, and that no promises had been made to him regarding his father's pending drug case. The judge precluded counsel from inquiring further. Defense counsel did not seek to pursue the matter further.

Cross-examination of a prosecution witness to show the witness's bias or prejudice is a matter of right under the Sixth Amendment to the Constitution of the United States and art. 12 of the Declaration of Rights of the Commonwealth. See *Olden* v. *Kentucky*, 488 U.S. 227, 331 (1988); *Commonwealth* v. *LaVelle*, 414 Mass. 146, 153 (1993). If "on the facts, there is a possibility of bias, even a remote one, the judge has no discretion to bar all inquiry into the subject." *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 400, cert. denied, 516 U.S. 861 (1995), citing *Commonwealth* v. *Aguiar*, 400 Mass. 508, 513 (1987). However, "[a] judge does have discretion to limit cross examination concerning possible bias when further questioning would be redundant." *Id.*

Considering the entire cross-examination in evaluating the defendant's claim, *Commonwealth* v. *Repoza*, 382 Mass. 119, 125 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987), and cases cited, we conclude that there was no error. Murphy's answer that he received a promise about his father's case was more beneficial than the explication during voir dire. Further inquiry was not requested, and it has not been shown that any further inquiry would have produced beneficial information. See *Commonwealth* v. *Watson*, 377 Mass. 814, 837 (1979). Moreover, the prejudicial impact of a promise to keep Murphy's family safe likely would have outweighed any impeachment value to the promise, as the jury might conclude that the promise arose from a need to keep them safe from the defendant.

(b) *Cross-examination of Murphy regarding grand jury testimony*. The defendant argues that he was erroneously prevented from impeaching Murphy with evidence of Murphy's prior inconsistent testimony before the grand jury. The judge would not permit defense counsel to ask Murphy if the prosecutor put words in his mouth through the use of leading questions. He did permit defense counsel to question Murphy by reading to the jury the prosecutor's questions and Murphy's answers. There was no restriction on the defendant's impeachment of Murphy through Murphy's prior inconsistent testimony. Defense counsel highlighted the inconsistencies repeatedly during recross-examination, and during closing argument. There was no error.[9]

(c) *Improper rehabilitation of Murphy*. The defendant next argues that the prosecutor improperly sought to rehabilitate Murphy's character for truth or veracity, even before he had been impeached. The prosecutor asked Murphy why he decided to cooperate with the police this time, when he had not done so in the past. Murphy replied, "They went too far this time, you know. They killed one of our own." The defendant objected and moved to strike the response. On appeal, the defendant claims that the question was improper because it elicited evidence of Murphy's character for veracity before it had been assailed, see *Commonwealth* v. *Sheline*, 391 Mass. 279, 288 (1984); P.J. Liacos, Massachusetts Evidence § 6.15, at 336 (7th ed. 1999), and the answer was equally improper because it suggested a pattern of bad behavior on the part of the defendant.

The prosecutor's question as to why Murphy decided to cooperate with the police was not rehabilitative as to the witness's character by evidence of reputation for veracity, but instead was directed at the witness's motive for testifying. The question sought to explain why Murphy, a "close friend" of the

___

[9] We inquire, pursuant to our obligation under G. L. c. 278, § 33E, whether the defendant was deprived of an otherwise available defense had defense counsel argued instead that Murphy's grand jury testimony should have been admissible for its probative value, under *Commonwealth* v. *Daye*, 393 Mass. 55, 65-72 (1984). We reach the same result. Defense counsel's point would not have been stronger had Murphy's answers been given affirmative, as opposed to impeachment, value. His testimony before the grand jury was itself inconsistent.

defendant, chose to cooperate in the murder investigation while on previous occasions he had not. The question was an otherwise proper anticipatory response to an unavoidable line of questioning which the defendant undoubtedly would, and did, raise. See *Commonwealth* v. *Saarela,* 376 Mass. 720, 724 (1978) ("[P]remature admission of evidence offered in anticipatory response to an opponent's claim not yet advanced, but later presented, need not of itself be prejudicial error, if it is error at all").

The defendant further argues that Murphy's response implied prior bad acts on the part of the defendant. See *Commonwealth* v. *Barrett,* 418 Mass. 788, 793 (1994) ("[T]he prosecution may not introduce evidence of a defendant's prior or subsequent bad acts for the purpose of demonstrating bad character or propensity to commit the crime charged"). On review of the record, it is clear that the witness's answer was not offered or used by the Commonwealth to imply that which the defendant argues on appeal. The context in which the prosecutor asked Murphy why he had decided to cooperate this time was that he had previously chosen not to cooperate. Thus, the focus of "this time" was on Murphy's willingness to cooperate, not on any prior bad act of the defendant. Furthermore, the prosecutor cured any potential prejudice from the statement by placing it in the proper context during his closing. There was no error.

(d) *Photographs of the victim.* The defendant's final claim of evidentiary error involves the admission in evidence of photographs of the victim. Over the defendant's objection, a total of ten photographs of the victim were admitted.[10] The defendant claims that these photographs were particularly grue-some and upsetting, and because the jury had been informed that the victim had been stabbed seventy-nine times after being shot in the mouth, the photographs were not necessary and did not legitimately advance the Commonwealth's case.

"The question whether the inflammatory quality of a photograph outweighs its probative value and precludes its admission is determined in the sound discretion of the trial

---

[10]Additionally, one photograph of the victim at the scene with a sheet covering his body, and three photographs of blood stains on the concession stand and the victim's clothing, were also admitted.

judge." *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999), and cases cited. See P.J. Liacos, Massachusetts Evidence, *supra* at § 11.6, at 708 ("The admissibility of photographic evidence is a matter left to the sound discretion of the judge"). A defendant bears a heavy burden of demonstrating an abuse of that discretion. See *Commonwealth* v. *Berry*, 420 Mass. 95, 108 (1995). This court "has almost never ruled that it was error to admit photographs of crime scenes and homicide victims." *Commonwealth* v. *DeSouza*, *supra*. This case is no exception.

The photographs of the victim, showing all seventy-nine stab wounds and the gunshot to the head, supported the Commonwealth's theory of murder in the first degree based on extreme atrocity or cruelty. See *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 431 (2001); *Commonwealth* v. *Jackson*, 428 Mass. 455 (1998); *Commonwealth* v. *Simmons*, 419 Mass. 426 (1995). As such, "they are not rendered inadmissible merely because they are gruesome or may be considered inflammatory." P.J. Liacos, Massachusetts Evidence, *supra* at § 11.6, at 708, and cases cited. See *Commonwealth* v. *Repoza*, *supra* at 129 ("[W]here the allegedly inflammatory element of a photograph offered as evidence is a natural and inevitable incident of the crime, and the photograph is otherwise probative, there is little basis to disturb the rulings of a trial judge as to its admissibility").

"The fact that a photograph is cumulative of other evidence has not required the exclusion of the photograph." *Commonwealth* v. *DeSouza*, *supra*, citing *Commonwealth* v. *Campbell*, 375 Mass. 308, 313 (1978). This is true even where the defendant agrees to stipulate to the facts that an offered photograph tends to prove. See *Commonwealth* v. *Nadworny*, 396 Mass. 342, 367 (1985), cert. denied, 477 U.S. 904 (1986). The judge did not abuse her discretion in admitting the photographs.[11] See *Commonwealth* v. *Cardarelli*, *supra*.

6. *Prosecutorial misconduct.* The defendant claims that the

_____

[11]Judges may, and in most cases should, "appropriately attempt to mitigate the potentially prejudicial nature of a photograph by instructing the jury that the photograph is to be used in analyzing evidence and is not designed to elicit sympathy." *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999), citing *Commonwealth* v. *Lawrence*, 404 Mass. 378, 390 (1989); *Commonwealth*

prosecutor (a) improperly vouched for the credibility of an immunized witness and (b) went beyond the bounds of permissible argument during his closing statement, thereby depriving him of a fair trial.

(a) *Improper vouching for immunized witness.* The defendant claims that the prosecutor improperly vouched for the credibility of Rogovich, an immunized witness, by telling the jury in his opening statement that Rogovich "was not given immunity for perjury." The Commonwealth, on the other hand, asserts that the unobjected-to statement was not improper vouching because the prosecutor did not personalize the immunity process or use the authority of the court to vouch for the witness's credibility. Because this claim is raised for the first time on appeal, asserted errors are significant only if they created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450 (1993).

Improper vouching can occur if an attorney expresses a personal belief in the credibility of a witness, see, e.g., *Commonwealth* v. *Bourgeois*, 391 Mass. 869 (1984), or indicates that he or she has knowledge independent of the evidence before the jury verifying a witness's credibility. See *Commonwealth* v. *Shelley*, 374 Mass. 466, 470 (1978), *S.C.*, 381 Mass. 340 (1980). This case presents neither scenario. The prosecutor merely made an accurate statement of law. The judge made substantially the same statement during the jury charge.[12] See *Commonwealth* v. *Kindell*, 44 Mass. App. Ct. 200, 208 (1998) (prosecutor's comment that immunity did not give witness "license to lie" did not constitute improper vouching).

Finally, the defendant claims that the assistant district attorney improperly inquired whether Rogovich remembered with whom he visited the crime scene. Because Rogovich was accompanied by the prosecuting attorneys, the defendant claims this question implicitly suggested to the jurors that the three prosecutors believed Rogovich's version of where the group had gone and when. We disagree. The exchange was part of an

v. *Richenburg*, 401 Mass. 663 (1988). Here, the judge properly instructed the jury as to the photographs.

[12]The judge instructed the jury, in pertinent part: "There is no immunity from a prosecution for perjury."

appropriate response to the defendant's suggestion that the prosecutor had coached the witness's testimony.

(b) *Prosecutor's closing argument.* The defendant contends that the prosecutor repeatedly went beyond the bounds of permissible argument during his closing argument. With the exception of two instances, the defendant does not provide any support from the record.[13] This does not rise to the level of appropriate appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Nevertheless, we have reviewed the prosecutor's entire closing argument with each allegation in mind pursuant to our obligations under G. L. c. 278, § 33E, and conclude that there was no error.

(i) *Right to testify.* The defendant claims that the prosecutor improperly commented on the defendant's failure to testify when he stated, "We can't cut open someone's skull, look inside, and see why. We can just go by what the evidence shows." To the defendant, this statement, which was repeated later in the closing, was an improper comment on the defendant's exercise of his right not to testify. See *Commonwealth* v. *Grant,* 418 Mass. 76, 83 (1994). Because defense counsel did not object to the prosecutor's closing at trial, we examine whether the asserted errors, if any, created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Marquetty, supra.*

The prosecutor's remarks directed the jury's attention to the question of the defendant's intent, an element the Commonwealth was required to prove beyond a reasonable doubt. They were similar to remarks judges commonly use to alert the jury to the importance of circumstantial evidence in determining questions of specific intent. They did not constitute improper comment on the defendant's failure to testify.

(ii) *Appeal to the jurors' emotions.* The defendant next argues that the prosecutor inappropriately appealed to the jurors' emotions by suggesting that the victim's body "testified" as to what transpired. See *Commonwealth* v. *Kozec,* 399 Mass. 514 (1987). The prosecutor told the jurors that the facts of this case "can be supported not just by testimony but by the body, Tommy Mo-

---

[13]The alleged errors were presented to the motion judge, who discussed each allegation and concluded there was no error.

ran's body testified." The Commonwealth asserts that the prosecutor's remark was characteristic at most of "enthusiastic rhetoric, strong advocacy, and excusable hyperbole," and did not cross the line between fair and improper argument. The defendant's objection to the statement, made after the jury instructions, was too late. See *Commonwealth* v. *Johnson*, 374 Mass. 453, 458 (1978). We review the claim to determine whether the errors, if any, created a substantial likelihood of a miscarriage of justice.

Closing arguments must be viewed "in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Viriyahiran-paiboon*, 412 Mass. 224, 231 (1992), citing *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 553 (1990). Instructions from the judge inform the jury that closing argument is not evidence, and these instructions may mitigate any prejudice in the final argument. See *Commonwealth* v. *Benjamin*, 399 Mass. 220, 223-224 (1987).

The Commonwealth pursued a conviction of murder in the first degree on the theory of extreme atrocity or cruelty. Prosecutors may refer to the condition of a victim's body in the context of demonstrating extreme atrocity or cruelty in the commission of the murder. See *Commonwealth* v. *Jones*, 400 Mass. 544, 548 (1987). See also *Commonwealth* v. *Vazquez*, 419 Mass. 350, 353 (1995) (prosecutor's statement that jury must take with them body of victim to deliberate was not improper appeal to emotion). The condition of the body is often the best evidence of the extreme atrocity or cruel nature of the crime. Thus, it was not improper to remind the jury to consider the victim's body as evidence. We do not think that the prosecutor's gothic rhetoric landed the dramatic blow about which the defendant complains.

The evidence against the defendant was particularly strong and the judge adequately instructed the jury to decide the case based on the evidence presented and not to be swayed by emotion. Thus, considering this statement in the context of the prosecutor's closing as a whole, against all the evidence presented and the judge's instructions, we conclude that the defendant has failed to demonstrate a substantial likelihood of a miscarriage of justice.

7. *Conflict of interest.* The defendant filed a motion for a new trial, alleging he was denied the effective assistance of counsel due to the professional association of his trial counsel with counsel for the codefendants. In denying the defendant's motion, the motion judge concluded that the defendant had not established the existence of an actual conflict or a potential conflict that materially prejudiced his case. Although we will not disturb a judge's subsidiary findings that are warranted by the evidence, "ultimate findings and conclusions of law, particularly those of constitutional dimensions, are open for our independent review." *Commonwealth* v. *Mahnke*, 368 Mass. 662, 667 (1975), cert. denied, 425 U.S. 959 (1976).

Under the Sixth and Fourteenth Amendments to the Constitution of the United States and art. 12 of the Massachusetts Declaration of Rights, criminal defendants are "entitled to the . . . assistance of counsel free of any conflict of interest and unrestrained by commitments to others." *Commonwealth* v. *Hodge*, 386 Mass. 165, 167 (1982), quoting *Commonwealth* v. *Michel*, 381 Mass. 447, 453 (1980). Our decisions have distinguished between actual and potential conflict of interest. To demonstrate an actual conflict, the defendant must prove that a genuine conflict existed. See *Commonwealth* v. *Davis*, 376 Mass. 777, 781 (1978). Once such a conflict is shown, "art. 12 does not require the defendant to show that the conflict resulted in actual prejudice or that it had an adverse effect on his counsel's performance." *Commonwealth* v. *Fogarty*, 419 Mass. 456, 459 (1995), and cases cited. However, where a defendant can show only a potential conflict, the conviction will not be reversed except on a showing of actual prejudice. See *Commonwealth* v. *Epsom*, 399 Mass. 254, 262-263 (1987).

(a) *Actual conflict.* The defendant contends that an actual conflict of interest existed as a result of the shared office space arrangement between his trial counsel and counsel for the other codefendants, and the association of his counsel with Rosemary Curran Scapicchio, counsel for the codefendant (Hardy). The judge concluded that the defendant failed to show any actual conflict of interest. We agree.

(i) *Shared office space.* In 1994, Thomas Amoroso, defendant's trial counsel, was a sole practitioner with an office located

at 200 High Street, Suite 300, in Boston. The suite was leased by Amoroso and two other attorneys. One of these attorneys was Stephan Neyman, defense counsel for codefendant Sullivan. One office was sublet to Scapicchio, defense counsel for codefendant Hardy. The suite consisted of eight separate offices, a small law library, a conference room, and additional space for a receptionist. The remaining offices were sublet to other professionals, including attorneys.

The defendant contends that the "shared space"[14] arrangement between his counsel and those for the codefendants constituted an actual conflict of interest, and he asks us to treat attorneys who share office space as members of the same firm or partnership for purposes of the rules of conflict of interest and imputed disqualification. We think that such a rule is unwarranted, and we are satisfied that the trial judge considered the appropriate factors in determining that an actual conflict of interest did not exist.

Neither the American Bar Association Model Rules of Professional Conduct (1983), nor the ABA Model Code of Professional Responsibility (1969), nor the former Massachusetts Rules of Professional Responsibility (in effect at the time of trial), nor the Massachusetts Rules of Professional Conduct automatically restrict or prohibit lawyers who maintain separate practices but share office space, personnel, equipment, or expenses from representing parties with adverse interests. See ABA/BNA

---

[14]While increasingly common, the association of lawyers in a nonpartnership shared office space arrangement is not a new addition to the practice of law. See Rockas, Lawyers for Hire and Associations of Lawyers: Arrangements That Are Changing the Way Law Is Practiced, 40 B.B.J. 8, 9 (1996) ("Associations of lawyers are not new, but have become more prevalent in recent years for economic reasons" [footnote omitted]). The pragmatic economic benefits, coupled with the collegiality of a law firm-type atmosphere, without the concomitant responsibilities and duties of a partnership, make this arrangement attractive, especially for new lawyers. See *id.* ("[T]he cost of running a law practice is significantly less when the expenses are divided among a number of attorneys. The economic benefits of associations can be particularly attractive to young lawyers who are attempting to build a practice with limited financial resources"). Such an arrangement presents unique concerns in cases such as this, where associated lawyers represent codefendants with potentially antagonistic defenses.

Lawyers' Manual on Professional Conduct 91:601.[15] We have also previously said that lawyers who share office space are not automatically barred from representing clients with adverse interests. See *Commonwealth* v. *Fogarty*, 419 Mass. 456, 459-460 (1995). Rather, an actual conflict of interest may arise between associated lawyers in office-sharing arrangements where the lawyers (1) hold themselves out to the public as a firm or (2) conduct themselves as a firm. See ABA/BNA Lawyers' Manual on Professional Conduct 91:605-606. See also G.C. Hazard & W.W. Hodes, The Law of Lawyering § 14.5 (3d ed. 2001) (similar analysis under ABA Model Rules). But the mere sharing of office space alone is ordinarily not enough to invoke our conflict of interest rules. See comment [1] to Mass. R. Prof. C. 1.10, 426 Mass. 1346, 1349 (1998) ("[T]wo practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm").

Whether an association of lawyers has held itself out as a firm or is otherwise prohibited from representing parties with adverse interests is a fact-bound inquiry requiring the court to consider several factors. Lawyers maintaining separate practices who share office space should not share letterhead, business cards, or telephone directory listings. See ABA Comm. on Ethics and Prof. Resp. Formal Opinion 310 (1963); MBA Opinion No. 76-19. The use of such items may lead the public to believe that the association is practicing as a firm. See ABA/BNA Lawyers' Manual on Professional Conduct 91:603. Also, office-sharers should not describe or name their affiliation in any way that will confuse or mislead the public. See MBA Opinion No. 85-2 (discussion of "professional association" to denote office-sharing arrangement). Each attorney must have his or her own telephone number. If a shared receptionist is employed, the receptionist should be instructed to answer the telephone as if it were the individual law office of the particular attorney. These

---

[15]Cf. Restatement (Third) of the Law Governing Lawyers § 123(3) (2000) ("Unless all affected clients consent to the representation . . . the restrictions upon a lawyer imposed by §§ 125-135 also restrict other affiliated lawyers who: (3) share office facilities without reasonably adequate measures to protect confidential client information so that it will not be available to other lawyers in the shared office").

safeguards, although defeating some cost-saving benefits of a shared-office relationship, are necessary to ensure that the public is not mislead into believing that the lawyers are associated as a firm.

In the present case, such procedures were followed, and taken into account by the judge. Here, each attorney was listed individually on the main listing in the lobby of the building and each had a separate telephone number.[16] Moreover, the shared receptionist was instructed to answer the telephone as if it were the individual law office of the particular attorney. Each attorney had separate letterhead, business cards, and secretarial support. Thus, the evidence supported the judge's finding that the attorneys did not hold themselves out to the public as a partnership,[17] a professional association or affiliation, or a law firm.

An association of office-sharing lawyers that does not hold itself out as a firm may nevertheless be treated as a firm or otherwise precluded from representing clients with adverse interests if the association operates like a firm either through its office-sharing arrangement, or by conduct operates in a manner that is inconsistent with the protections afforded by legal representation. If the physical organization of the office suite places client confidences at risk, it is appropriate to treat the association as a firm or to determine that adverse interests may not be represented. To this end, attorneys seeking to maintain separate practices in a shared office arrangement should have separate offices, and should not have access to offices of other attorneys who do not share their practice. More importantly, office-sharing attorneys should not have access to each other's files. See *Custody of a Minor (No. 2)*, 13 Mass. App. Ct. 290, 303 (1982) (no disqualification where attorneys do not share access to files). Additionally, while the associated attorneys may properly share a receptionist, they must not share any personnel who has access to sensitive or privileged materials. With regard

---

[16]The attorneys shared a facsimile machine, and therefore had the same facsimile number. The use of the same facsimile number does not create an actual conflict.

[17]The use of "200 High Street Partnership" was simply the name of a checking account created for the purpose of paying for joint expenses on the suite, and for no other purpose.

to facsimile machines, office-sharing attorneys must either maintain separate machines, or warn all potential users of a shared machine that facsimile communications are not private, and they must establish office procedures to prevent confidential materials from being seen by persons other than those employed by the attorney. See ABA/BNA Lawyers' Manual on Professional Conduct 91:606. Finally, lawyers must restrict access to photocopy machines and establish office procedures to prevent sensitive materials from being left in the machine and seen by persons not in the attorney's employ.

In this case the arrangement among the attorneys and their subtenants was a "shared space" arrangement and client confidences were generally appropriately protected. Each attorney had a separate office in the suite, but shared common expenses, including the receptionist, conference room, library, facsimile, and photocopy machine. Secretarial services were properly kept separate. Although each attorney had keys to the main door of the suite, individual offices had separate locks. Active client files properly were kept in individual offices and there was no central filing system. Amoroso kept his files inside his personal office, to which only he and his secretary possessed keys. The attorneys observed appropriate procedures in their physical office arrangement necessary to maintain the integrity of their separate law practices. The record is silent, however, as to the existence of a protocol for use of the shared facsimile machine and photocopier, but this is a failure in the defendant's proof.

"One of the socially important reasons for law partnerships and similar aggregations of legal talent is to permit lawyers who trust each other's judgment and legal skills to call on each other for help as sounding boards, specialists and emergency cover." C. Wolfram, Modern Legal Ethics § 7.6.2 (1986). Where office-sharing attorneys divulge or share client confidences to take advantage of the collective experience of the associated lawyers, the association will be subject to our conflict of interest rules, and will not be permitted to represent parties with adverse interests. The same result will apply where "emergency cover" for associated lawyers goes beyond the mere relaying of non-confidential messages. Finally, any fee sharing agreement among

nonpartnership office-sharing lawyers must satisfy Mass. R. Prof. C. 1.5 (e), 426 Mass. 1317 (1998).

Here, all the attorneys, during the period at issue, were involved in criminal defense work, and it was not unusual for one attorney informally to discuss cases and issues in a general sense. However, the judge found that no client confidences were divulged, and this finding is supported by the record. Additionally, the judge found that on rare occasions one attorney would stand in for another attorney in court, but these appearances were typically limited to delivering nonconfidential messages or explaining absences. Finally, while the attorneys, on occasion, might refer a client to another attorney in the suite, there was no sharing or splitting of fees. Consequently, the judge did not err in concluding that there was no actual conflict of interest as a result of the office-sharing arrangement.

(ii) *Association of defense counsel with counsel for codefendant Hardy.* In July, 1994, Amoroso learned that Scapicchio was representing codefendant Hardy. Members of Hardy's family asked Scapicchio if she knew of an attorney who could represent Allison, and she asked Amoroso if he were interested in the case. Amoroso responded that he would be interested, but inquired about his fee. Scapicchio told Amoroso that she had arranged through Hardy to have her fee paid from the proceeds of a personal injury case involving Hardy's sister, and suggested that a similar arrangement could be worked out for Amoroso. Scapicchio arranged an assignment of the proceeds of Hardy's sister's personal injury claim to cover Amoroso's fee.

Initially, the defense was collaborative. A joint meeting among defendants and their counsel took place. Hardy and Sullivan had requested such meetings to discuss ideas and to determine whether they had a common defense or whether they should sever the cases. The attorneys, sometime later, discovered that the defendants' defenses would be antagonistic and thus moved to have the cases of each defendant severed. Separate trials were ordered, and at some point thereafter, the defendant was visited in jail by an investigator for Scapicchio.[18] The investigator asked the defendant if he were cooperating with the

---

[18]It is not clear from the record whether Scapicchio directed her investigator to speak to the defendant with Amoroso's prior approval. See former

prosecution. The defendant then called Amoroso and directed him to tell Scapicchio that he was not cooperating with the prosecution.

Scapicchio accompanied Amoroso to one additional meeting with the defendant shortly before his trial began. The visit was intended to prepare the defendant to testify by conducting a mock cross-examination with Scapicchio assuming the role of assistant district attorney. The defendant claims that (1) the referral of his case to Amoroso; (2) the fee arrangement orchestrated by Scapicchio; (3) the joint defense meetings; and (4) the "mock" examination all demonstrate an actual conflict of interest.

The burden is on the defendant to prove, without mere conjecture or speculation, both the existence and the precise character of the alleged conflict of interest. See *Commonwealth v. Soffen*, 377 Mass. 433 (1979). The defendant's unsubstantiated claim that Amoroso would be "beholden to [Scapicchio] for the opportunity to handle his first murder case" does not meet this standard. The defendant has failed to show how a "unique" relationship with Scapicchio had "infused his attorney with conflicting loyalties." *Id.* at 438. Furthermore, Amoroso, consistent with his duties, fully explained to the defendant how he became involved in the case and that if retained, despite his association with Scapicchio, his first loyalty would be to him, and the defendant agreed to the representation. There was no error.

A lawyer owes a duty of undivided loyalty to his or her client. See *Commonwealth v. Patterson*, 432 Mass. 767, 775-776 (2000). The assertion that Amoroso would owe or feel any duty of loyalty to the Hardys as a result of the fee arrangement is unfounded. S.J.C. Rule 3:07, Canon 5, DR 5-107 (B), as appearing in 382 Mass. 782 (1981), in effect at the time of trial, provided "[a] lawyer shall not permit a person who . . . pays

---

S.J.C. Rule 3:07, Canon 7, DR 7-104 (A) (1), as appearing in 382 Mass. 786 (1981), now Mass. R. Prof. C. 4.2, 426 Mass. 1402 (1998). If Amoroso had given his approval, allowing the investigator to interview the defendant in his absence is most troublesome. However, there has been no showing that the visit occurred as a result of an actual conflict, and even if there had been a potential conflict, there has been no showing that the defendant told the investigator anything that resulted in actual prejudice to the defendant.

him to render legal services for another to direct or regulate his professional judgment in rendering such legal services." This rule is substantially similar to the current Mass. R. Prof. C. 1.8 (f), 426 Mass. 1339 (1998), which states: "A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client consents after consultation; (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 1.6." See also Mass. R. Prof. C. 5.4 (c), 426 Mass. 1410 (1998) (lawyer shall not permit nonclient who pays bill to direct or regulate lawyer's exercise of professional judgment on the client's behalf); *In re Nardi*, 10 Mass. Att'y Discipline Rep. 204 (1994).

Here, Amoroso complied with these requirements. The defendant was presented with and consented to the arrangement after consultation with Amoroso. Furthermore, Amoroso's compensation was completely dependent on the independent success of the civil lawsuit. The Hardys did not realistically have the means, through the "lure of the fee," to coerce, cajole, or otherwise exercise undue influence over his independent professional judgment. See *Commonwealth* v. *Jiminez*, 27 Mass. App. Ct. 1165, 1167 (1989). Finally, the compensation was offered to the defendant by Hardy's sister because of Hardy's and the defendant's friendship. Both agreed to retain private counsel. This arrangement did not create any obligation to satisfy the Hardys. Finally, there is no evidence that client confidences were divulged. The caution Amoroso showed in arranging the fee led the motion judge to conclude that this arrangement did not even cause a potential conflict. This finding is supported by the record.

The joint defense meetings were not inherently conflicted. It is appropriate for counsel to explore all avenues to advance the defendant's interests, including the identification of circumstances that might require separate trials. Nor was Scapicchio's mock cross-examination of the defendant an actual conflict of interest, but it had the potential for conflict where her client (Hardy) had been convicted and his appeal was pending. There was a potential that she might have discovered something favor-

able to her client and detrimental to the defendant. However, as we discuss in the section below, the burden is on the defendant to show actual prejudice, and he has failed to do so.

The defendant has failed to show the existence of an actual conflict in the meeting with Scapicchio's investigator. There is no evidence that the meeting, though highly questionable, see note 18, *supra*, took place because of some divided loyalty on the part of Amoroso. Moreover, the defendant did not say anything to the investigator other than that he was not willing to cooperate with the prosecution, so even if Amoroso had a potential conflict of interest, there has been no showing of actual prejudice.

(b) *Potential conflict.* Where a defendant can show only a potential conflict, the conviction will not be reversed except on a showing of actual prejudice. See *Commonwealth* v. *Epsom*, 399 Mass. 254, 262-263 (1987). The defendant bears the burden of providing both the existence and the precise character of the alleged conflict of interest without conjecture or speculation. See *Commonwealth* v. *Davis*, 376 Mass. 777, 781 (1978). The defendant argues that, in addition to the evidence of an actual conflict stemming from the improper association of defense counsel and counsel for the codefendants, he suffered at least two other instances of material prejudice.

(i) *Improper association of defense counsel and counsel for the codefendants.* The defendant claims that, even if the shared office space arrangement does not create an actual conflict of interest, it does give rise to a potential conflict. We agree, but only to the extent that if a protective protocol for sharing of the facsimile machine and the photocopier had been adopted, a breach of that protocol could have resulted in the disclosure of confidential information. There is no evidence of a breach of protocol, but more significant is the absence of any evidence, after hearing, that the defendant suffered any prejudice from any breach, as was his burden to show. We conclude, therefore, that the motion judge did not err in determining that no potential conflict materially prejudiced the defendant.

(ii) *Claim of recent contrivance.* The defendant argues that he suffered material prejudice as a result of a joint defense meeting. At the meeting, Hardy's investigator allegedly yelled at a

defense witness, Jackie Vargus. The defendant claims that if the investigator had not been present at the meeting, then Vargus may have told Amoroso earlier about Rogovich's statement that he, Rogovich, was not at Columbus Park when the killing occurred. Therefore, he reasons, the Commonwealth could not have impeached Vargus with a claim of recent contrivance. This is mere conjecture. See *Commonwealth* v. *Davis, supra* at 781. Moreover, Vargus testified that she did tell people about Rogovich's statement at the joint meeting when the investigator yelled at her. There is no merit to the argument that, absent the yelling, she would have made the disclosure earlier.

(iii) *Failure to file a motion to dismiss.* Finally, the defendant claims that he suffered material prejudice because a motion to dismiss was not filed in his case on the ground that he was handcuffed and shackled in front of the grand jury. However, the defendant has failed to demonstrate how this was the result of a conflict of interest between defense counsel. See *Commonwealth* v. *Croken*, 432 Mass. 266, 272 (2000).

Additionally, the motion judge, although noting that the appearance of the defendant in handcuffs and shackles before the grand jury was "highly improper," the integrity of the grand jury proceeding was not so impaired as to require the dismissal of the indictment. The judge concluded that the grand jury had more than sufficient evidence to indict the defendant for armed robbery and murder. Thus, although his appearance may have indicated that he was considered a dangerous person, it did not likely tip the scales in the grand jury's decision to indict. The motion judge considered the appropriate factors, and her finding is well supported. There was no error.

8. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the record and the defendant's arguments, and discern no reason to reduce the degree of guilt or order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*