COMMONWEALTH *vs.* CRAIG HOLLIDAY
(and nine companion cases[1]).

Suffolk. November 9, 2007. - March 14, 2008.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial, Assistance of counsel, Admissions and confessions, Instructions to jury. *Protective Order. Attorney at Law,* Conflict of interest. *Evidence,* Exculpatory, Relevancy and materiality.

In a murder case arising from an altercation between rival gang members, the trial court judge did not abuse his discretion in issuing a protective order limiting the defendants' access to the addresses and locations of Commonwealth witnesses, where the threat to the witnesses' safety (i.e., the risk of retaliation) was inherent in the situation [802-804]; further, the defendants failed to demonstrate that the protective order, although stringent, denied them a fair trial, the effective assistance of counsel, or the right to cross-examine and confront witnesses [805-806], or created a conflict of interest in their attorneys [806-807].

Criminal defendants failed to demonstrate that their trial counsel had rendered ineffective assistance by failing adequately to investigate and raise the defense that a third party had committed the crime [811-813]; by failing to move to suppress, on Sixth Amendment grounds, the statement that one defendant had made to the police after a complaint and arrest warrant had been issued against him [813]; or by failing to object to the judge's instruction to the jury on returning a "safe" verdict [813-814].

At a murder trial, there was no error in the admission in evidence of witness testimony about fear of retaliation, where the evidence was offered by the prosecutor to rehabilitate witnesses impeached about their failure to share information sooner. [814-815]

At a murder trial, there was no error in the admission of evidence of a subsequent shooting for which the defendants were arrested, where the evidence connected the defendants with the murder weapon and supported the Commonwealth's theory that the defendants intended to kill members of a rival

[1]Four against Holliday and five against Jeffrey Mooltrey.

The defendants' convictions of armed home invasion were placed on file. The record does not indicate whether the defendants consented to the filing of these convictions. We consider all the defendants' convictions on the issues raised on appeal. However, the convictions placed on file are remanded to the Superior Court for sentencing unless the defendants consent to their filing. See *Commonwealth* v. *Lawson,* 425 Mass. 528, 529 n.1 (1997), and cases cited.

gang, and where the judge gave a limiting instruction to the jury on the proper use of the evidence. [815-816]

At a murder trial, the judge acted within her discretion in permitting the victims' mothers to identify photographs and to testify to biographical details of the victims, where the testimony was brief, and where the prosecutor did not emphasize or exploit the testimony's emotional potential. [816]

INDICTMENTS found and returned in the Superior Court Department on October 3, 1996.

A motion for a protective order for discovery was heard by *Vieri Volterra,* J.; the cases were tried before *Barbara J. Rouse,* J., and motions for a new trial, filed on April 7 and 14, 2003, were also heard by her.

*James W. Rosseel* for Craig Holliday.

*Stephen B. Hrones* for Jeffrey Mooltrey.

*Amanda Lovell,* Assistant District Attorney, for the Commonwealth.

*David H. Mirsky,* Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

CORDY, J. In the early morning hours of March 31, 1991, gang members Craig Holliday and Jeffrey Mooltrey went to an after-hours party in the Roxbury section of Boston. At the party, Nathaniel Rivers, the leader of a rival gang, and a bystander, Mia Sanders, were shot to death. On October 3, 1996, Mooltrey and Holliday were indicted. On May 22, 1998, a jury convicted them each on two indictments charging murder in the first degree, on theories of deliberate premeditation and felony-murder; two indictments charging armed home invasion; and one indictment charging each with possession of a firearm.[2]

On appeal from their convictions and the denials of their motions for a new trial, Mooltrey and Holliday raise a number of issues. Both challenge the issuance of a protective order that restricted their access to identifying information in the statements of witnesses, arguing that it deprived them of their constitu-

[2]The defendants were sentenced to consecutive life terms for the murder convictions and concurrent terms of from four to five years for firearm possession.

tional rights to a fair trial, to assist in their defense, and to effective representation. They both also claim that their attorneys were ineffective in failing adequately to investigate or pursue third-party culprit defenses. Holliday separately contends that his attorney was ineffective in failing to object to a statement made during the judge's instructions to the jury, and in failing to move pursuant to the Sixth Amendment to the United States Constitution to suppress his confession. He further claims that evidentiary errors, including the admission of testimony of the victims' mothers, testimony from witnesses about their fears of retaliation, and evidence of motive, deprived him of a fair trial. Finally, both defendants seek relief under G. L. c. 278, § 33E, contending that the cumulative effect of errors at trial deprived them of due process, and that justice requires that they receive new trials. We affirm the judgments of conviction and the order denying the motions for a new trial.[3] See note 1, *supra*.

1. *Trial.* We summarize the evidence presented at trial. Holliday and Mooltrey were members of a gang called the "Big Head Boys." Holliday was one of its leaders. The Big Head Boys were rivals of a neighboring gang, the "Intervale Street Posse." Holliday's older brother, Todd Holliday (Todd), was not a member of either gang. However, on March 23, 1991, Todd was shot and killed while walking with Aslaam Mooltrey (Aslaam), Mooltrey's brother. Aslaam reported to Mooltrey and Holliday that the Intervale gang was responsible for Todd's death.

Following his brother's murder, Holliday repeatedly told other members of his gang that he was "going to get the mother fuckers," in revenge for Todd's death. He told one friend to stay away from Intervale members because "crazy stuff" was about to happen. Less than seventy-two hours after Todd's burial, Rivers and Sanders were killed when gunfire broke out in the basement of a home on Fayston Street. The basement was the location of a periodic after-hours party that Intervale members, including Rivers, often attended. Approximately eighty people were at the party on the night of the shooting. Sanders attended with her boy friend.

---

[3]We acknowledge the amicus brief filed by the Committee for Public Counsel Services.

Before they went to the party, Holliday, Mooltrey, and a third individual, Maurice Ramsey, met with Tyrone Dickerson, also a member of the Big Head Boys, at his sister's apartment. Holliday told Dickerson that Intervale members were going to be at the party, declared that he was going to get revenge for his brother, and pledged "an eye for an eye." Mooltrey echoed the same intentions. Holliday, Mooltrey, and Ramsey left the apartment armed with handguns. Holliday asked Dickerson to come with them, but he declined.

Witnesses at the party heard from four to six shots ring out and saw both Holliday and Mooltrey firing handguns. Some of the witnesses observed Holliday pull his gun out and fire. Others saw "sparks" coming from Mooltrey's arm. Rivers was shot in the back as he ran for the stairs. He died in a hospital later that morning. Sanders was caught in the cross-fire and died at the scene.

The police found several shell casings and one spent bullet in the basement, and subsequently recovered part of one of the bullets that struck and killed Rivers. From this evidence, they were able to establish that three different types of handguns were used. When they arrived at the scene, they also encountered James Whiteside, who had been shot outside the home.

After the shootings, Holliday, Mooltrey, and Ramsey returned to Dickerson's apartment and boasted about shooting Rivers. The boasts were later repeated to others. Holliday also said that he was going to "get them all," apparently referring to other members of the Intervale gang.

Six weeks after the murders of Rivers and Sanders, Steven Niles, another member of the Big Head Boys, accompanied by Holliday and Mooltrey, shot two additional Intervale gang members. After the shooting, the three retreated to Dickerson's apartment building, where the police soon arrived. Niles, Mooltrey, and Dickerson were found hiding in the building's basement, and Holliday was discovered in a neighboring apartment. The police also found guns in the basement, one of which fired the bullet that killed Rivers.[4]

The police investigation into the murders of Sanders and

---

[4]Although the barrel of the gun was missing at the time of trial, there was testimony confirming the ballistics match.

Rivers thereafter faltered due to the reluctance of witnesses to provide information against gang members. Years later, members of the Boston police cold case squad interviewed Holliday, who was then incarcerated on other offenses. After advising him of his Miranda rights, the officers showed him a binder of material they had accrued in their investigation against him, explained that they had a complaint and warrant for his arrest for the murders, and informed him that they knew what happened at the party. Holliday agreed to speak to the police and gave them a statement admitting that he was at the party and had fired his gun, but claiming that he fired because he was afraid of Rivers, who smiled mockingly at him and then reached for something that Holliday thought might be a weapon.[5] He also told police that, although Mooltrey had come to the party with him, Mooltrey did not fire any of the shots.

The officers also met with Mooltrey and advised him of his rights. After the officers told Mooltrey that they had already spoken with Holliday, Mooltrey gave them a statement, claiming that he had gone to the party with friends, and that those friends, not he, had done the shooting. He refused to identify any of those friends.

The defense theories at trial were largely consistent with the statements the defendants had made to the police — that Holliday acted in self-defense, and that Mooltrey had been present only and did not participate in the shootings. Both counsel vigorously cross-examined the witnesses called by the Commonwealth, many of whom either had given inconsistent (and noninculpatory) statements shortly after the shootings or had only recently come forward. The Commonwealth countered this examination by eliciting testimony regarding the fearful circumstances that had confronted the witnesses who lived in the area dominated by the two gangs.

Counsel for Holliday called two defense witnesses, a ballistics expert and a psychologist. The ballistics witness questioned police handling and testing of the gun and other ballistics evidence recovered during the investigation. The psychologist testified as to the tests he had administered on Holliday, his conclu-

---

[5] The police found no weapon on Rivers when they arrived at the scene.

sion that Holliday was of borderline intelligence, and his opinion that Holliday possessed a diminished ability accurately to perceive or react logically and reflectively to what was actually happening in any given situation. Neither defendant testified.

The judge gave extensive instructions to the jury, including instructions regarding the three theories of murder in the first degree pressed by the Commonwealth (premeditation, extreme atrocity or cruelty, and felony-murder), joint venture liability, diminished capacity, and self-defense.

2. *New trial motions.* In April, 2003, the defendants filed motions for a new trial and requested an evidentiary hearing. They contended that a pretrial protective order entered at the Commonwealth's request had improperly impeded their preparation for trial. They also argued that their attorneys were ineffective because they failed to present third-party culprit defenses. The motion judge, who was also the trial judge, held an evidentiary hearing that extended over five days in 2004 and 2005.[6]

a. *The protective order.* On October 28, 1996, shortly after the indictments were returned, the Commonwealth filed a motion for a discovery protective order. In it, the Commonwealth asked the court to enter an order restricting the defendants' access to identifying information contained in the statements of civilian witnesses, either by permitting the redaction of such information from the statements, by providing the statements to defense counsel on the condition that they not be made available to the defendants, or by providing defense counsel with access to witnesses rather than their addresses. In its supporting memorandum and at a hearing, on October 28 and November 6, the Commonwealth explained that the fear of retaliation in this gang-related double homicide was so great that no witness with information about the murders was willing to speak to the police

---

[6]The judge also granted an evidentiary hearing on Holliday's claim that the statement he made to police while in custody was involuntary. During the hearing, Holliday "waived, in writing, any issue [he had raised in his motion] related to custodial interrogation." Counsel for Holliday contends that Holliday did not waive his claim that his statement was obtained in violation of Holliday's Sixth Amendment right to counsel, and that trial counsel was ineffective for not raising that ground in Holliday's motion to suppress the statement. The judge did not address the merits of this issue in her decision. We address the issue *infra.*

initially; that only after the passage of five years had witnesses finally been willing to come forward; and that some of the witnesses resided in areas where the gangs operated and others were incarcerated and unable to protect themselves should copies of witness statements circulate in their penal institutions. Consequently, the Commonwealth argued, it was legitimately concerned that witnesses might be intimidated or threatened prior to trial unless a protective order was entered.

The judge who heard the pretrial motion (not the trial judge) found that there was "a great risk that retaliation could take place endangering the witnesses for the Commonwealth," citing Mass. R. Crim. P. 14 (a) (6), 378 Mass. 874 (1979), and *Commonwealth* v. *Stewart*, 365 Mass. 99 (1974). He directed the Commonwealth to draft a proposed protective order, which he subsequently entered in the following form:

> "I order that the addresses and locations of witnesses in the above-captioned matter not be disclosed to Defense Counsel or the Defendants. I further order Defense Counsel not to give written copies of transcribed witness statements, reports containing witness statements, or witness statements in any form to the defendants or any other persons. I order Counsel for the Commonwealth to make available witnesses for Defense counsel, in order that Defense Counsel may request interviews with the witnesses, and interview the witnesses if they are willing to be interviewed. I make these orders in order to protect the safety of the witnesses."

The order was later modified to permit defense counsel (and their investigators) access to the addresses of the witnesses who made statements.[7]

At the evidentiary hearing on the defendants' motion for a new trial, trial counsel for both defendants testified regarding the protective order and how it affected their ability to prepare for trial. Scott Curtis, attorney for Holliday, testified that during the period between the hearing on the protective order and the

---

[7]The defendants petitioned a single justice of this court pursuant to G. L. c. 211, § 3, to overturn or modify the protective order. The petitions were denied on the ground that the issue was capable of review, if necessary, on appeal from any criminal convictions.

time it issued,[8] he asked the assistant district attorney whether it would be acceptable for him to discuss the names of the witnesses with Holliday and to give Holliday witness statements from which the names and addresses of the witnesses were redacted. The assistant district attorney responded affirmatively, stating that his goal was to prevent witness statements with identifying information on them from circulating around prisons or on the street, because this could result in witness intimidation. Consequently, Curtis redacted the names and addressees of witnesses from the statements, police reports, and grand jury minutes he received and sent the redacted copies to Holliday. When Curtis met with Holliday, they discussed both the names of witnesses and the contents of their statements. Curtis also testified that although he initially had concerns about the impact the protective order might have on his ability to represent Holliday, those concerns dissipated because he was able to provide the redacted statements to Holliday and because Holliday was aware of who the witnesses were. Ultimately, Curtis testified that he was able adequately to prepare his client's defense.[9]

Elda James, Mooltrey's attorney, testified that she initially abided by the literal terms of the protective order as she understood them. During that time, she would visit Mooltrey and read entire witness statements to him, without giving him a copy of the statements. She also testified that she discussed with Mooltrey the names of the witnesses, and he indicated that he knew all of them. She eventually gave Mooltrey a set of redacted witness statements after speaking with the assistant district attorney in January, 1998, about her client's insistence on having a set of copies for his own perusal. Although she found the conditions "less than ideal," she testified that she was satisfied that she was able to prepare adequately Mooltrey's defense,

---

[8]The hearing was held on October 28 and November 6, 1996. The judge's indorsement allowing the Commonwealth's motion is dated November 13, 1996. The protective order (drafted by the Commonwealth at the judge's request) is signed by the judge and dated November 4, 1996. Nothing in the cases turns on the apparent disparity in the date of the order.

[9]A letter written by Holliday to Curtis dated February 11, 1998 (three months before trial), was also admitted in evidence at the motion hearing. In it, Holliday described the grand jury testimony of certain witnesses, revealing that he had read their testimony and that he knew who they were.

given that he knew the names of the witnesses and eventually had redacted copies of their statements, and that she had hired an investigator to assist her.

Holliday did not testify at the evidentiary hearing on this subject. Mooltrey testified that James would bring redacted witness statements to him and allow him to read them, but never provided him with a set to keep.

The judge credited the testimony of both defense counsel that the defendants were informed of the contents of the statements of the witnesses, had copies of the redacted witness statements prior to trial, and were fully aware of who the witnesses were. She also credited their testimony that they were able to prepare adequately for trial.

The judge ruled that the judge who had entered the protective order "permissibly concluded [based on what was presented to him in the Commonwealth's motion] that the threat to witnesses from the circulation of witness statements was inherent in the situation," and that the order entered, "although restrictive, did not deprive the defendants of the content of the witness statements, nor did it deny them access to the witnesses themselves, as the witnesses were made available to defense counsel for interviews." Ultimately, she concluded that "[d]espite the stringent terms of the protective order entered by the court, the actual procedures employed in this case, the use of redacted statements and grand jury minutes by agreement between defense counsel and the assistant district attorney, enabled the defendants to assist effectively in the preparation of their case." We agree.

It is beyond debate that a defendant has the right to gain access to relevant evidence that bears on the question of guilt or innocence or that will otherwise help his defense, and to use that evidence to confront witnesses through cross-examination. See *Commonwealth* v. *Mitchell*, 444 Mass. 786, 795 (2005). Cf. *Smith* v. *Illinois*, 390 U.S. 129, 131 (1968) ("[t]he witness'[s] name and address open countless avenues of in-court examination and out-of-court investigation"). It is constitutionally permissible, however, to impose limits on pretrial discovery in criminal cases, *United States* v. *Randolph*, 456 F.2d 132, 135-136 (3d Cir. 1972), to ensure the safety of witnesses, so long as such

limits do not deny the defendant his right to the effective assistance of counsel and a fair trial.

Rule 14 (a) (6) permits the entry of protective orders of the type entered in this case where circumstances require. Specifically, the rule provides in relevant part: "Upon a sufficient showing, the judge may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate. . . . The judge may, for cause shown, grant discovery to a defendant on the condition that the material to be discovered be available only to counsel for the defendant."[10] The decision to enter such an order lies within a trial judge's discretion. See *Commonwealth* v. *Cobb*, 379 Mass. 456, 469-470 (1980), vacated on other grounds sub nom. *Massachusetts* v. *Hurley*, 449 U.S. 809 (1980), appeal dismissed, 382 Mass. 690 (1981) (no abuse of discretion in declining to order prosecution to turn over addresses of witnesses); *Commonwealth* v. *Stewart*, 365 Mass. 99, 106 (1974) (judges have discretion to limit disclosure of grand jury testimony to defendants in order "to protect persons mentioned or for other reasons of security").[11]

The defendants first contend that the Commonwealth was required to make a factual showing of a specific threat to witness safety, and that such a showing was not made in this case, either by affidavit or sworn testimony, before the protective order issued. Although the Commonwealth bears the burden of demonstrating that the safety of a witness would be put at risk if information, otherwise required to be disclosed, was made available to the defendant in the absence of a protective order, we have previously held that it need not demonstrate a specific or actual threat to the safety of a witness when the danger to witness safety is inherent in the situation. See *Commonwealth* v. *Francis*, 432 Mass. 353, 357-358 (2000) (in murder case involving rival gangs,

---

[10]Although rule 14 was rewritten in 2004, see Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004), rule 14 (a) (6) remains essentially unchanged.

[11]General Laws c. 258B, § 3 (*d*), also entitles witnesses to be informed of the level of protection available to them, and to receive protection from harm and threats of harm "arising out of their cooperation with law enforcement and prosecution efforts." The statute provides that a court may enter orders to "maintain limited disclosure of the information as it deems appropriate to protect the privacy and safety of . . . witnesses." G. L. c. 258B, § 3 (*h*).

judge properly found threat to safety of Commonwealth's wit-
ness inherent in situation, which relieved Commonwealth of
burden to demonstrate actual threat to witness); *Commonwealth*
v. *Cobb, supra* at 469-470, quoting *McGrath* v. *Vinzant,* 528
F.2d 681, 684 (1st Cir. 1976) (in murder involving rival
motorcycle gangs, "[a]lthough it is preferable for the judge,
based on representations of counsel or witnesses, to make an
express finding that disclosure of the addresses would create an
unwarranted threat to the safety of the witnesses, it is abundantly
clear that in this case the threat was 'inherent in the situa-
tion' "); *Commonwealth* v. *Johnson,* 365 Mass. 534, 545 (1974)
(in some circumstances, threat is inherent and would not require
specific demonstration).

In granting the order at issue here, it was permissible for the
judge to determine that the Commonwealth's representations
that the crimes were the result of a murderous feud between
gangs still operating in the neighborhood where the witnesses
lived were reliable, that for years witnesses had been reluctant
to come forward out of fear for their safety, and that those wit-
nesses who were then incarcerated were particularly fearful of
the defendants obtaining copies of statements made against
them, and distributing those statements in the prisons, making
them the potential targets of violence. It was not error for the
judge to have concluded that "[t]here is great risk that retaliation
could take place, endangering the witnesses for the Common-
wealth." In other words, even absent evidence of a specific threat,
"the threat [to witnesses] was 'inherent in the situation.' " *Com-
monwealth* v. *Cobb, supra* at 470. There was no abuse of discre-
tion in issuing a protective order in these circumstances.[12]

---

[12]In reaching this conclusion, we do not consider St. 2006, c. 48, § 4, which
was enacted long after the protective order issued in this case, and inserted
G. L. c. 268, § 13D (*d*). Section 13D (*d*) specifically authorizes a court to issue
a "protective order prohibiting defense counsel from distributing grand jury
transcripts to a criminal defendant." To secure such an order, the Commonwealth
must demonstrate that "the defendant is accused of a violent crime, as defined
in section 121 of chapter 140, and that there is a reason to believe, based on
specific and articulable facts including, but not limited to, the defendant's past
history of violence and the nature of the charges against the defendant, that the
defendant poses a threat to a witness or victim."

We express no view on how this statute might affect the issuance of protec-
tive orders similar to the one entered in these cases.

The defendants next challenge the restrictive wording of the protective order, regardless of how it may have been implemented. As the motion judge found, the protective order, even modified to ensure that defense counsel (and their investigators) had access to the addresses of witnesses who made statements to the police (and the grand jury), is stringent. However, it did not prevent defense counsel from telling the defendants who the witnesses were (and they did so), nor did it prevent counsel from reviewing the witness statements with them (which they also did). Indeed, the order required the Commonwealth to make the witnesses available to defense counsel, if they desired to interview them. See *Commonwealth* v. *Rivera*, 424 Mass. 266, 269-272 (1997), cert. denied, 525 U.S. 934 (1998) (withholding witnesses' current addresses did not impinge on defendant's right to prepare defense and to fair trial when defendant's counsel given opportunity to communicate with witnesses). What the order prohibited was giving copies of the witness statements to the defendants. The purpose of this prohibition, as explained by the Commonwealth, was to keep copies of witness statements, on which their names and addresses were recorded, from being circulated in prison and in the neighborhood so as to subject the witnesses to abuse and intimidation. We need not decide whether such an order might ever unconstitutionally impinge on a defendant's rights with respect to a fair trial, because in this case, the defendants were provided with redacted copies of the witness statements by agreement with the Commonwealth. Such an accommodation was consistent with the stated purpose of the protective order (if not its literal wording) as requested and drafted by the Commonwealth.

In addition, the defendants have made no showing that counsel were unable to cross-examine witnesses effectively because of the order, or were unable to communicate with their clients or otherwise unable to prepare adequately their defense. The evidence was to the contrary. Regardless of the breadth of the protective order, the defendants have not demonstrated that they suffered any prejudice from its entry. *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 396-397 (1975) (denial of motion for names and addresses of witnesses not abuse of discretion and did not violate constitutional rights where defendant

did not show prejudice). The judge's conclusions that the defendants were not denied a fair trial, the effective assistance of counsel, or the right to cross-examine and confront witnesses as a result of the order are amply supported in the record.

Finally, the defendants argue that the protective order created a conflict of interest in their attorneys, in essence presenting them with a choice between complying with the court's order or providing dedicated service to them. To the extent they complied with the order, the defendants claim their counsel were ineffective.

A conflict of interest may give rise to a claim of ineffective assistance of counsel. *Commonwealth* v. *Goldman*, 395 Mass. 495, 503 & n.10 (1985). If a defendant demonstrates an actual conflict of interest, art. 12 of the Massachusetts Declaration of Rights does not require the defendant to show that the conflict resulted in actual prejudice or that it had an adverse effect on counsel's performance.[13] See *Commonwealth* v. *Allison*, 434 Mass. 670, 688, 696 (2001); *Commonwealth* v. *Fogarty*, 419 Mass. 456, 459 (1995). "However, where a defendant can show only a potential conflict, the conviction will not be reversed except on a showing of actual prejudice." *Commonwealth* v. *Allison, supra* at 688.

Although a conflict of interest may exist when an attorney's regard for one duty leads to the disregard of another, *Commonwealth* v. *Goldman, supra* at 503, a lawyer's duty to advance the interests of his client are properly limited by his duty to comply with court rules. See *Nix* v. *Whiteside*, 475 U.S. 157, 166-167 (1986), quoting Canon 32 of the ABA Canons of Professional Ethics (1908) (no client entitled to receive, nor

[13]Mooltrey argues that prejudice can be presumed and need not be proved where the circumstances are such that a competent lawyer would likely not be able to render effective assistance. *Ouber* v. *Guarino*, 293 F.3d 19, 33 (1st Cir. 2002). This is not such a case. As the record of the evidentiary hearing plainly establishes, competent defense counsel were able to render effective assistance. This is not an instance in which, for example, a defendant was hindered from having confidential communications with counsel due to a conflict of interest. Cf. *Commonwealth* v. *Downey*, 65 Mass. App. Ct. 547, 553-554 (2006) (finding prejudice presumed where conflict of interest demonstrated; attorneys agreed to wear microphones for benefit of television productions, causing defendants to feel that they could not have confidential communications with attorneys).

should lawyer render, service or advice involving disloyalty to law); *Commonwealth* v. *Mitchell*, 438 Mass. 535, 548-549, cert. denied, 539 U.S. 907 (2003) (counsel's compliance with ethical obligations did not create actual conflict of interest). There is no actual conflict of interest here, and to the extent that a potential conflict may have existed, the defendants have not demonstrated prejudice. *Commonwealth* v. *Allison, supra.*

b. *Ineffective assistance of counsel.* We address here all ineffective assistance of counsel claims raised in the motions for a new trial and in the defendants' direct appeals. In their motions for a new trial, Holliday and Mooltrey contend that their trial counsel were ineffective in failing adequately to investigate and raise third-party culprit defenses. Holliday also argues that his counsel was ineffective for failing to move to suppress, on Sixth Amendment grounds, the statement he made to the police after a complaint and arrest warrant had been issued against him. Additionally, in his direct appeal, Holliday claims that counsel should have objected to the judge's instruction to the jury on returning a "safe" verdict.

"In evaluating a defendant's claim of ineffective assistance of counsel in a capital case, we consider whether there was error at trial and, if so, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003). We give trial counsel's tactical decisions due deference, unless those decisions are manifestly unreasonable when made. *Commonwealth* v. *Denis*, 442 Mass. 617, 625 (2004). "While counsel certainly has 'a duty to make reasonable investigations,' counsel is also afforded the opportunity to 'make a reasonable decision that makes particular investigations unnecessary.' " *Id.* at 629, quoting *Strickland* v. *Washington*, 466 U.S. 668, 691 (1984). See *Breese* v. *Commonwealth*, 415 Mass. 249, 253 (1993) (defense counsel not required to investigate all individuals mentioned as suspects in police interrogation). "Neither ineffectiveness nor a likelihood of a miscarriage of justice arise from counsel making the best he can out of the circumstances of the crime." *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 471 (1998). A defendant must do more than raise a speculative theory that further investigation might have identified someone else as one of the shooters. *Commonwealth* v.

*Murphy*, 442 Mass. 485, 507 (2004). To be successful he must show that counsel's failure deprived him of a substantial ground of defense, and that better work would have accomplished something material. *Commonwealth* v. *Phinney*, 446 Mass. 155, 162 (2006).

i. *Third-party culprit defense.* Both defendants contend that their lawyers were ineffective for failing to pursue a third-party culprit defense theory that was apparent from the information in witness statements they had received in discovery. Specifically, they contend that had their lawyers been effective, they might have established that a third party, James Whiteside, had the motive and opportunity to kill Rivers.

Holliday argues that if counsel had interviewed four Commonwealth witnesses before trial (Tyrone Dickerson, his sisters, and Darnell Henderson), he would have known that they would undercut his self-defense theory,[14] and therefore should have pursued a third-party culprit strategy. Mooltrey argues that a third-party culprit defense was his only available defense, and that it was consistent with his statement to the police that he was there but did not fire any of the shots.

The information the defendants point to is contained in police reports of statements made by Cassandra Samuel, Travers Washington, and James Whiteside, all of whom attended the party. According to the report of her interview, Samuel told the police that after the shooting in the basement, "at the porch area she observed a man falling over the railing, apparently shot, [and] this man dropped a handgun [and] told another male that was with him to pick the gun up and screw." She stated that the other man then fled.[15]

Washington told the police that "[Rivers] had a conversation with [Washington] regarding a problem that he had with a couple

---

[14]The Dickersons testified about Holliday's expressed desire to get revenge on the members of the Intervale Street Posse. Similarly, Henderson testified that Holliday warned him, in advance, to stay away from Intervale gang members because "crazy stuff" was about to happen. These witnesses provided evidence that countered in part Holliday's self-defense argument.

[15]Samuel testified at the motion hearing that she remembered making a statement to the police but did not recall its content. She also testified that while she remembered being at the party, she did not remember hearing a shot or seeing someone with a gun.

of Jamaicans, one known as James Whiteside, the other one known as Robert Maloney. The two Jamaicans allegedly ripped [Rivers] off for a lot of drugs." Washington was at the party at the time of the shootings. He reported that he heard shots inside, and then shots outside. Washington informed the police that two days earlier one of Rivers's friends, Edward Walker, also known as "Cudapie," responded to Rivers's being "ripped-off" "by these two Jamaicans for a large sum of drugs" by approaching Whiteside on a scooter and "pull[ing] a gun." Whiteside, who was on a bicycle, jumped off and ran. In their report of this interview, the police further wrote, "[Washington] tells us that Cudapie was going up to shoot Whiteside as a result of the rip-off of Nate Rivers." Washington also informed the police that he "spoke to [Rivers] about the problem regarding their beef and he was speaking to the Jamaicans, Whiteside and Maloney, trying to squash it so that nobody was going to get hurt that night." Washington further revealed that he saw Whiteside with what he believed to be "a 9 millimeter eighteen-shot Glock" earlier that day. He told the police that he was let into the Fayston Street party by Whiteside. Last, Washington told the police that as a result of the rip-off and Cudapie incident, he believed that Whiteside and Maloney were involved in the shooting of Rivers, although he did not see the person who fired the shots.

Whiteside told the police that "while [he was] inside the basement and using the toilet shots rang out, then a group of about twenty people entered the bathroom[,] pushing him into the wall." He explained where the bathroom was located in the house. He said that "about 10 minutes later he left the bathroom [and] he then went outside where he was shot. He stated that he did not see who shot him." He described his shooter as "black male, dark skinned, 20 to 21 years . . . slight beard, dark clothing. Wearing a black Champion hood." He could not see him fully because of the hood. When asked if the man looked like the one who assaulted him previously he said that he looked similar, but he could not "swear to [it] being Cudapie." When Whiteside was shown a group of photographs relative to the earlier event, he selected Cudapie as the one who pulled the gun on him. Whiteside said that the unidentified man "shot him, and he after being shot fell over the porch out into the yard and [Maloney] came to

his aid with another male he did not know. They picked him up and walked to the front, at which time the ambulance came along and treated them there."

At the motion hearing, both trial counsel were questioned about their knowledge of the information contained in these reports and their decision not to investigate further or pursue a third-party culprit defense strategy at trial. Scott Curtis did not recall if he sent an investigator to interview Whiteside, and did not recall much about the shooting of Whiteside, but emphasized that in the circumstances, a third-party culprit theory was not viable. Given Holliday's admission to having shot Rivers (albeit in self-defense), the failure of his motion to suppress that admission, and the powerful independent evidence that he was one of the shooters, Curtis's tactical decision (made after consulting with Holliday) to pursue a self-defense and diminished capacity theory, rather than a third-party culprit defense, was eminently reasonable. There was no ineffectiveness.

Mooltrey's argument stands on a stronger footing. Elda James testified that she was aware that Whiteside was shot outside the party that night. She stated that she attempted to find Samuel, but that her investigator was unsuccessful, so she did not call her at trial. She also recalled that her investigator had tried to locate Washington and Whiteside, but could not find them either. She further testified that her investigator was using the addresses provided by the prosecutor, and the witnesses were apparently not there.[16]

In his argumentative questioning of James, Mooltrey's appellate counsel suggested that had the witnesses been called, Washington could have testified to Whiteside's motive to kill Rivers and to Whiteside having a nine millimeter handgun (there was evidence that a gun of that caliber was fired inside the basement), and Samuel could have testified to Whiteside's asking someone to get rid of his gun. James answered by stating her belief that this evidence would not have raised a reasonable doubt when viewed in conjunction with all of the other evidence admitted at trial. She reiterated her conclusion that Whiteside was not involved in the shooting that occurred in the basement,

---

[16]At the time of the hearing, the investigator was no longer in business and had apparently moved away, and James did not know his whereabouts.

which she based on witness statements placing him in the toilet at the time it occurred.[17] The fact that Whiteside was shot the same evening did not change her view in light of it occurring outside of the party and later in time. She was also of the view that Whiteside, if he could have been found, would have asserted his privilege under the Fifth Amendment to the United States Constitution.

Although James testified that her private investigator could not find these witnesses, a private investigator hired by appellate counsel testified that he was able to locate Samuel and Washington. Washington was in jail, and somewhat harder to locate than Samuel, although he had used the same residential addresses since 1993. Samuel had an unlisted telephone number, but he found her by searching through computer records. Samuel was called to testify at the hearing, and testified that, although she moved in 1994, she had not moved since. She also testified that she made no effort to hide herself, and that no one spoke to her about the case until the week before the hearing, when the appellate attorney's investigator came to her house.

A defendant is permitted to present third-party defenses; evidence of another person's motive, intent, and opportunity to commit the crime is admissible only if it has a rational tendency to prove the issue and is not too remote or speculative. *Commonwealth* v. *Keohane*, 444 Mass. 563, 570-571 (2005), and cases cited. A defendant must demonstrate that the acts of another person are "so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime." *Commonwealth* v. *Conkey*, 443 Mass. 60, 66 (2004), quoting *Commonwealth* v. *Hunter*, 426 Mass. 715, 716-717 (1998).

The judge concluded that James's decision not to pursue a third-party culprit theory did not constitute ineffective assistance of counsel. While acknowledging that counsel has a duty to make either a reasonable investigation or a reasonable decision

---

[17]Initially James testified that she thought that Whiteside was outside of the basement, and that if Washington was going to say that Whiteside was inside, she would have been interested in his testimony. Once it was established that Whiteside admitted to being inside, she argued that Washington's testimony would not have raised a reasonable doubt in any event.

that renders a particular investigation unnecessary, *Commonwealth* v. *Denis*, 442 Mass. 617, 629 (2004), and that failure to investigate the only defense available constitutes ineffective assistance, *Commonwealth* v. *Farley*, 432 Mass. 153, 156-157 (2000), she also recognized that counsel's tactical decision amounts to ineffective assistance only if it is manifestly unreasonable when made, *Commonwealth* v. *Denis, supra* at 625, and that the defendant must show that the failure to pursue the third-party culprit theory deprived him of a substantial ground of defense and that better work would have accomplished something material.

The judge found Samuel's statement "not particularly helpful" in establishing a third-party culprit defense, as it did not closely link Whiteside with the shooting of the victims. She also found that although Washington's statement suggests that Whiteside had motive and opportunity to shoot Rivers, "it does not cast doubt upon the identification of Mooltrey as a joint venturer." She concluded that, in light of the evidence, Mooltrey did not demonstrate that counsel's pursuit of the third-party culprit theory would have accomplished something material for the defense.

We agree. The evidence against Mooltrey included testimony that he left for the party with Holliday and Ramsey, armed with a handgun, for the express purpose of getting even with the Intervale gang for killing Holliday's brother; his admission to being at the scene; eyewitness testimony that he was firing one of the guns; and statements made after the shooting confirming his participation in the killing of Rivers. If evidence could have been developed (something Mooltrey has not established) that Whiteside (or the person who shot Whiteside) was also one of the people who fired a handgun in the basement, it would not have cast doubt on the identification of Mooltrey as one of the persons committing the crimes, where the ballistics evidence was consistent with three shooters. Cf. *Commonwealth* v. *Santiago*, 425 Mass. 491, 503-504 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998) (defendant who engages in shoot-out responsible for ensuing deaths whether or not he actually fired fatal shot). There was no error in the denial of Mooltrey's motion for a new trial on this ground. Nor

do we find that counsel's strategic decision created a substantial likelihood of a miscarriage of justice.

ii. *Sixth Amendment claim.* Holliday contends that his counsel was ineffective for failing to argue, as one of the grounds of his motion to suppress his confession, that the government violated his Sixth Amendment right to counsel by questioning him without counsel after his Sixth Amendment right had attached by reason of the issuance of a criminal complaint and arrest warrant against him. See *Kirby* v. *Illinois*, 406 U.S. 682, 688-689 (1972) (Stewart, J.) (Sixth Amendment right to counsel triggered by formal charge, indictment, arraignment, information, or preliminary hearing).

Trial counsel is not ineffective for failing to challenge well-settled Massachusetts law. See *Commonwealth* v. *Conceicao*, 388 Mass. 255, 264 (1983) (failure to pursue futile motion does not constitute ineffective assistance of counsel). Holliday acknowledges that under Massachusetts law and procedure, the mere ex parte issuance of a complaint and arrest warrant by a magistrate does not trigger a defendant's Sixth Amendment right to counsel. *United States* v. *Santiago*, 474 F. Supp. 2d 209, 213 (D. Mass. 2007), quoting *Commonwealth* v. *Welch*, 420 Mass. 646, 654 (1995) (no ineffective assistance of counsel when counsel failed to seek suppression of contraband found in public park given that "it was well settled in Massachusetts" that individuals had only very limited expectation of privacy in area routinely used by others). See *Commonwealth* v. *Torres*, 442 Mass. 554, 571 n.13 (2004) ("Because of the nature of complaint and arrest warrant procedure in Massachusetts, a procedure that is . . . entirely ex parte . . . and that does not necessarily result in a prosecution of the charge, we have held that that procedure does not trigger the Sixth Amendment right to counsel"); *Commonwealth* v. *Smallwood*, 379 Mass. 878, 884-885 (1980) ("complaint and arrest warrant procedure . . . does not amount to an adversary judicial proceeding, nor does anything occur at this stage which could impair a defense"). However, he urges the court to revisit the issue. We decline to do so.[18]

iii. *The "safe verdict" instructions.* Holliday takes issue with

---

[18]In *Commonwealth* v. *Torres*, 442 Mass. 554, 571 n.13 (2001), we also

the judge's statement, made twice during her instructions to the jury, that "we are counting on all of you to get this to a safe verdict." He argues that this statement effectively made the judge an advocate for the prosecution. *Commonwealth* v. *Sneed*, 376 Mass. 867, 870 (1978) (role of judge is that of impartial arbitrator, not prosecutor). Taken in context, however, the statements represented no such advocacy. The judge was emphasizing the importance of jurors not speaking with anyone about the case or seeking outside information. The judge's urging the jury to keep their deliberations within proper bounds, so they could reach verdicts untainted by outside considerations, was not improper. Counsel was not ineffective for failing to object to this instruction.

3. *Evidentiary issues.* Holliday challenges the admission in evidence of witness testimony about fear of retaliation, evidence of the shooting of other Intervale gang members, and the testimony of the victims' mothers. There was no error.

A number of the Commonwealth's witnesses did not initially come forward to provide information to the police, or made statements claiming no knowledge of the shootings or the defendants' involvement in the murders. On cross-examination, defense counsel properly attempted to discredit those witnesses who had

declined to address whether our line of precedent relating to the issuance of a complaint and the attachment of the Sixth Amendment right to counsel conflicts with Federal law. Courts are divided as to whether complaints trigger Sixth Amendment rights, and their positions often turn on the function of complaints in a State's criminal process. See, e.g., *Patterson* v. *Illinois*, 487 U.S. 285, 295 n.8 (1988); *United States* v. *Moore*, 122 F.3d 1154, 1155-1156 (8th Cir. 1997), cert. denied, 522 U.S. 1135 (1998) (criminal complaints do not trigger Sixth Amendment rights where they function primarily as prerequisites to arrest warrants); *Felder* v. *McCotter*, 765 F.2d 1245, 1247-1248 (5th Cir. 1985), cert. denied, 475 U.S. 1111 (1986) ("We look to state law to determine when adversarial proceedings against the accused have commenced, implementing the . . . right to counsel. . . . The filing of an affidavit or criminal complaint . . . constitutes the institution of formal judicial criminal proceedings in Texas"). Even had Holliday's Sixth Amendment right to counsel attached at the issuance of the complaint, Holliday was informed of and waived his Miranda rights before answering any of the officer's questions. *Patterson* v. *Illinois*, *supra* (when suspect who has not requested counsel waives right to counsel after receiving warnings equivalent to Miranda warnings, that will generally suffice to establish knowing and intelligent waiver of Sixth Amendment right to counsel for purposes of postindictment questioning). See *Commonwealth* v. *Torres*, *supra* at 572.

only recently come forward, suggesting they had something to gain from their recent cooperation, and to impeach others with their initial statements, which did not inculpate the defendants.[19] The Commonwealth responded, on redirect examination, by asking those witnesses why they had delayed or told different stories at the time of the shootings. The witnesses explained that they feared retaliation.

It is proper for the prosecutor to rehabilitate a witness who has been impeached about his failure to share information sooner, even when the explanation would, absent the defendants' opening of the issue, be more prejudicial than probative. *Commonwealth* v. *Richardson*, 423 Mass. 180, 187 (1996), quoting *Commonwealth* v. *Errington* 390 Mass. 875, 881 (1984) (testimony is admissible for rehabilitation purposes when "the fact that the statement was made, regardless of its truth or falsity, tended to rehabilitate the Commonwealth's witness by explaining why, after a long period of silence, she complained of the defendant's conduct"). There was no error.

Holliday argues that the admission in evidence of the subsequent shooting of two other Intervale gang members for which he, Mooltrey, and Stephen Niles were arrested, which was admitted at trial over his objection, was more prejudicial than probative. In connection with that arrest, the gun that fired the bullet that killed Rivers was recovered.

Although evidence of prior bad acts may not be offered to prove bad character or criminal propensity, such evidence may be admitted for another purpose where its probative value is not substantially outweighed by the danger of prejudice. *Commonwealth* v. *Stroyny*, 435 Mass. 635, 641 (2002), and cases cited. The decision to admit such evidence lies within the sound discretion of the trial judge. *Commonwealth* v. *Stewart, ante* 25, 36 (2007). Here the evidence connected the defendants with the murder weapon, see *Commonwealth* v. *Otsuki*, 411 Mass. 218, 235-236 (1991) (evidence that after murder, defendant possessed gun that may have been murder weapon was relevant and more probative than prejudicial), and supported the Commonwealth's theory that the defendants intended to kill members

---

[19]Defense counsel also raised these issues in their opening statements.

of the rival gang. The "challenged evidence was relevant to the issues of the defendant[s'] motive and intent to kill [Rivers] . . . and to [Holliday's] claim that he lacked the requisite mental capacity to commit the crime with which he was charged." *Commonwealth* v. *Stroyny*, *supra* at 641-642, and cases cited. Further, the judge gave a limiting instruction to the jury on the proper use of the evidence. Given the probative value of the evidence, and the instruction, the judge did not abuse her discretion in admitting it.

Holliday also argues that the testimony of the victims' mothers, admitted over objection, unfairly appealed to juror sympathy and prejudiced the defendants. The mothers of both Rivers and Sanders were permitted to identify photographs and testify to biographical details of the victims. They both testified about learning of the shootings, and about going to a hospital to find their children.

While we have urged "caution in admitting evidence in criminal cases that appears to be more related to evoking sympathy [than] to proving the elements of the alleged crime," *Commonwealth* v. *Gordon*, 422 Mass. 816, 831 (1996), the Commonwealth may properly tell the jury "something of the person whose life [has] been lost in order to humanize the proceedings." *Commonwealth* v. *Evans*, 439 Mass. 184, 195 (2003), quoting *Commonwealth* v. *Degro*, 432 Mass. 319, 322-323 (2000). A photograph may be admitted for this purpose. *Commonwealth* v. *Degro*, *supra* at 323. The testimony here, including sidebar discussions, covered only fifteen pages of a nine-volume transcript. We have repeatedly deemed this type of brief testimony admissible. *Commonwealth* v. *Evans*, *supra* at 196 (no error in victim's mother's testimony, covering four pages of eleven volumes of trial transcript, in which she identified photograph of her son, testified that he was twenty-two years of age when he died, that he had five year old child, and that he cried when he looked at her as he was being placed in ambulance). The prosecutor did not emphasize or exploit this testimony's emotional potential. Contrast *Commonwealth* v. *Santiago*, 425 Mass. 491, 494-497 (1997) (in opening and closing statements prosecutor referred twelve times to victim's being pregnant and that she had been murdered on day before her eighteenth birthday). The judge acted within her discretion in admitting the testimony.

4. *Review under G. L. c. 278, § 33E.* The defendants ask the court to exercise its plenary power under G. L. c. 278, § 33E, and reduce the murder verdicts or grant them new trials. They argue that the cumulative effect of the errors described mandate relief, and stress that they were unable to assist in preparing their defense because of the protective order. After a complete review of the record, we decline to exercise our power. The protective order did not prevent the defendants from getting a fair trial or presenting a full and vigorous defense. The trial record is replete with evidence that Holliday and Mooltrey intended to commit and did commit the murders with which they were charged, resulting in the loss of two young lives including that of an innocent bystander. On this evidence, we find no occasion for § 33E relief.

*Judgments affirmed.*[20]

*Orders denying motions for a
new trial affirmed.*

---

[20]See note 1, *supra.*